Sapp v. Christie Bros.

GEORGE W. SAPP, APPELLEE, V. CHRISTIE BROTHERS,
APPELLANTS.*

FILED JULY 12, 1907.   No. 14,924.

Master and Servant: APPLIANCES: ASSUMPTION OF RISK. "Where a
    servant, in obedience to the requirements of his master, incurs
    the risk of machinery or appliances which, although dangerous,
    are not of such character that they may not be safely used by
    the exercise of reasonable skill and caution, he does not as a
    matter of law assume the risk of injury from accident resulting
    from the master's negligence." *Lee v. Smart,* 45 Neb. 318; *Sioux
    City & P. R. Co. v. Finlayson,* 16 Neb. 578.

APPEAL from the district court for Douglas county:
WILLIAM A. REDICK, JUDGE. *Affirmed.*

*Lambert & Winters,* for appellants.

*W. R. Patrick* and *Jacob Fawcett, contra.*

AMES, C.

This is an appeal from a verdict and judgment awarding
damages in an action for personal injuries. There is no
considerable dispute of fact. The plaintiff was a man 25
years of age, reared on a farm, and accustomed to the use
of teams of horses, harness and wagons, and their appli-
ances, and somewhat familiar with the streets and general
conditions of South Omaha, Nebraska, in which city the
defendants were engaged in the retail coal and feed busi-
ness. On a Saturday he applied to the defendants for em-
ployment in the driving and management of a delivery
wagon in connection with their trade, he to furnish a team
of horses and harness. One Sherwood, who was in general
charge or management of the defendant's business, or some
branch of it, directed the plaintiff's attention to a light
wagon which had been in use about six months, and which
he stated the latter would be required to use in case of the

*Rehearing allowed. See opinion, p, 705, *post.*

hiring. It was noted that the wagon was not then, and never had been, provided with a brake, and that the neck-yoke appeared to be somewhat old and season-cracked, and that the "pole eye," a leather attachment in which the end of the wagon pole is inserted and by which the latter is supported when in use, was considerably worn and weakened. Nothing further was said about any of these matters, except that Sherwood furnished the plaintiff with some baling wire, which the latter wound about the neck-yoke, so as to add to its strength and to that of the leather, and remarked that the defendants were rushed with business just then, but that, when they had caught up with their orders, they "would have these things fixed up a little better." The plaintiff engaged for the services of himself and team and harness for the term of six months, and begun work on Monday morning, when the foregoing conversation took place at the time of attaching the team to the wagon. Plaintiff remained in the employment thence continuously until about noon of the following Thursday, when he attempted to deliver a load of feed to one McMasters. A shed or stable to which the delivery was to be made stood adjoining an alley, extending through a block of ground and connecting two streets. It was a public way much used or traveled, but the surface of the ground was some 10 or 12 feet lower where the building stood than was that of the street, 61 feet distant, whence the plaintiff approached it. The plaintiff, sitting on the wagon, having reached the summit of the declivity, paused a moment to survey the situation, and then reined his team into the alley and started down the incline. McMasters was present, having first provided himself with a "chuck block" to put under a wheel and stop the descent when necessary. In some manner, no one knows just how or from just what cause, possibly from contact with the coal or feed house, one end of the neck-yoke, to which the hame straps were attached, broke off while the wagon was descending, and that end fell down; immediately the leather "pole eye" gave way, the pole dropped to the ground, struck an ob-

struction, bent and broke, and a piece of it flew upward and hit the plaintiff, knocking him from his seat and inflicting injuries complained of. The team ran away. The answer consists of denials and a plea of contributory negligence.

The contention on behalf of the defendants is that the facts are insufficient to support the verdict. Of course, the first matter to be considered in this connection is whether the defendants are guilty of negligence, and this inquiry resolves itself into the preliminary question whether it was an act of negligence to use the wagon without a brake and with the defective neck-yoke for the transportation and delivery of comparatively heavy loads over the steep grades and precipitous streets and alleys of the city of South Omaha. To the eye of natural reason this question, under the circumstances of this case, would, we think, appear to be wholly immaterial. It is not a case in which the servant was ordered or commanded by his master to put himself in a place of danger or to use dangerous or defective tools, machinery or appliances, nor is it a case in which the servant relied upon the real or supposed superior knowledge, experience or judgment of his master. On the contrary, the plaintiff and the defendants, or Sherwood, the representative of the latter, seem to have been about equally capable and well informed, and the former acquainted himself with all the deficiencies of the vehicle and dangers of its use before he entered upon his service with it. If such use could have been reasonably anticipated to result in injury to a third person and had done so, or had been a criminal offense under a statute, it cannot be doubted that in the one instance the parties would have been joint tort-feasors, or that in the other they might have been jointly indicted and convicted. How then can it be said that either party can impute to the other the consequences of a wrongful or negligent act in which both participated? The plaintiff was under no compulsion, legal or moral, the relation of master and servant or of employer and employee did not exist, and no contractual

obligation was assumed, until after all the elements of danger to which he exposed himself by entering upon the service had become fully known to him.

But it is said that the plaintiff relied, and rightfully so, upon the promise of Sherwood to repair. It is hardly a fair construction of the indefinite remark that, "when they caught up with their orders, they would have these things fixed up a little better," which treats it as a definite promise or contractual obligation to repair. But, supposing it to be such, counsel for plaintiff cites and relies upon two former decisions of this court. The first is *Sioux City & P. R. Co. v. Finlayson,* 16 Neb. 578, in which it is said that "the true rule might be stated to be that, if the defective machinery, though dangerous, is not of such a character that they may not be reasonably used by the exercise of care, skill and diligence, the servant does not assume the risk. If the servant, in obedience to the requirement of the master, makes use of machinery which, though dangerous, is not so much so as to threaten immediate injury, or where it is reasonably probable it may be safely used by extraordinary caution or skill, the master would be liable for a resulting accident." This language is quoted with approval and adopted as a basis for judgment in *Lee v. Smart,* 45 Neb. 318. In both cases the servant well knew the defects and dangers which resulted in his injury. In the latter instance they came to his knowledge at the time he entered upon his employment, and in the former the promise to repair was no better than that above quoted, so that we are unable to distinguish the cases from that now before us. Owing to a lack of mental acumen the writer is unable to reconcile them with the general rules of law or with the principle underlying the doctrine of contributory negligence, but that does not matter. Under the authority of those decisions, if it was negligent to use the wagon for the purpose and under the circumstances above narrated, it was the negligence of the defendants alone, and whether it was such is a question of fact for the determination of the jury. And, in like manner, it was a

question of fact for the decision of the jury what degree of care and skill was required by the plaintiff in the use of the wagon, and whether he made use of so much on the occasion of his injury. It is not complained in brief or or argument by counsel that these questions were not fairly submitted to the jury by instructions, and the judgment ought therefore, upon the authorities cited, to be affirmed.

JACKSON and CALKINS, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

The following opinion on rehearing was filed March 5, 1908. *Former judgment of affirmance adhered to:*

Master and Servant: APPLIANCES: NEGLIGENCE. A servant, who has been induced by a master's promise of repair to begin or continue to work with defective appliances, may use such defective appliances without being guilty of contributory negligence and without assuming the risk of injury from such defects, so long as he may reasonably expect the master's promise of repair to be kept, unless the danger from using such defective appliances is so obviously imminent and immediate that no reasonably prudent person would begin or continue to work with them.

GOOD, C.

This cause is now before us upon a rehearing. The former opinion is reported, *ante,* p. 701, where a statement of the facts essential to an understanding of the case will be found.

At the outset it may be well, perhaps, to state that we think the following language used in the former opinion: "The relation of master and servant or of employer and employee did not exist, and no contractual obligation was assumed until after all the elements of danger to which he exposed himself by entering upon the service had be-

48

come fully known to him"—is somewhat misleading, and is an erroneous statement of the record. The record discloses that the contract was entered into upon Saturday, the 3d day of October, 1903, to begin on the following Monday, when, pursuant to the agreement, Sapp reported with his team to Christie Brothers for duty, and was, by a member of the firm, directed to take his team and harness to one Sherwood, who would direct him in the performance of his duties. Pursuant to these directions, Sapp then entered upon his employment, and went with his team to the office where Sherwood was, who then took Sapp out to the wagon and directed him to use it. In the course of hitching to the wagon, Sapp discovered the condition of the neck-yoke. We think the relation of master and servant, under the circumstances, began from the moment that Christie Brothers directed Sapp to take his team and harness to Sherwood. It will be conceded, of course, that the discovery by Sapp of the defective condition of the neck-yoke was at the outset of his employment; but the discovery was made after the actual employment had begun. Counsel for appellants lay some stress upon the fact that in the former opinion the foregoing language was used, and that, since the relationship of master and servant did not exist, therefore, the rule laid down in *Sioux City & P. R. Co. v. Finlayson*, 16 Neb. 578, and *Lee v. Smart*, 45 Neb. 318, had no application to the case at bar. We are inclined to the view that it would be immaterial whether the discovery of the defect by Sapp was made before or after he entered the employment of Christie Brothers. In *Crooker v. Pacific L. & M. Co.*, 34 Wash. 191, 75 Pac. 632, it is held that, if the employee at the time of his employment and at the time of the accident saw the defect and complained of the same to the master, who promised to repair the same, and went to work and continued to work under the promise, where the danger was not so imminent and immediate that a reasonably prudent man would not go to work or continue to work, then the employee did not assume the risk

of an injury resulting from the defect.   In the instant case, it appears that the appellee had made special preparation, by the purchase of an additional horse and a set of harness, for the express purpose of enabling him to carry out his contract of employment with the appellants. There would be as strong an incentive for him to wish to enter upon the employment and carry out his contract as there would have been if he had been employed for some time.   In the present case, practically the only question at issue is whether or not there is sufficient evidence to sustain the verdict.

The evidence is undisputed that the neck-yoke which was furnished to the appellee was defective and unsafe, and that this was known to both parties before Sapp used it.   The rule is well settled that it is the duty of the master to exercise reasonable care to provide reasonably safe tools and appliances for his servants.   In this respect appellants were negligent, and the only question is as to whether or not the appellee was guilty of contributory negligence, or assumed the risk of injury, by using the defective and unsafe neck-yoke.   The rule of law is well established that, where the servant has knowledge that the tools and appliances furnished him are defective and unsafe and he continues to use the same without objection. or protest, he then assumes the risk.   *Vanderpool v. Partridge, ante,* p. 165.   In the case at bar, however, the servant did not use the appliances without protest, but made timely objections, and was met by the master with assurances that the defect would be remedied. The foreman said that "the neck-yoke was all right, just to take it along, and the first time we got the orders caught up, or when they got them caught up, they would have things fixed up a little better."   The servant further protested, and the foreman procured a piece of wire, and told Sapp to wrap that on the neck-yoke, and assured him that the neck-yoke would be repaired when the orders were caught up.   There was other evidence which tended to show that the foreman represented to Sapp that, consider-

ing the loads he would have to haul and the roads over which he would have to drive, the neck-yoke was sufficient. These representations, assurances and promises of the foreman were, no doubt, put forth for the purpose of inducing Sapp to go on with the work until the neck-yoke could be repaired, and we think the jury were justified in finding that Sapp relied upon these assurances and promises. Under this state of facts, can it be said that Sapp was guilty of contributory negligence in using the neck-yoke, or that he assumed the risk incident to its use, by remaining in the employment and continuing to use it from Monday until the following Thursday?

The rule which we think applicable to the case is laid down in 1 Shearman and Redfield, Negligence (5th ed.), sec. 215, in the following language: "There is no longer any doubt that, where a master has expressly promised to repair a defect, the servant does not assume the risk of an injury caused thereby within such a period of time after the promise as would be reasonably allowed for its performance, or, indeed, within any period which would not preclude all reasonable expectation that the promise might be kept." In 2 Cooley, Torts (3d ed.), 1157, it is said: "If the servant, having a right to abandon the service because it is dangerous, refrains from doing so in consequence of assurances that the danger shall be removed, the duty to remove the danger is manifest and imperative, and the master is not in the exercise of ordinary care unless or until he makes his assurances good. Moreover the assurances remove all ground for the argument that the servant, by continuing the employment, engages to assume its risk." The rules, as here announced, are fully discussed and followed in the case of *Hough v. Texas & P. R. Co.*, 100 U. S. 213, and the rule is there stated in the following language: "If the servant, * * * who has knowledge of defects in machinery, gives notice thereof to the proper officer, and is promised that they shall be remedied, his subsequent use of it in the well-grounded belief that it will be put in proper condition within a reasonable

time, does not necessarily, or as matter of law, make him guilty of contributory negligence. It is a question for the jury whether in relying upon such promise and using the machinery after he knew its defective or insufficient condition, he was in the exercise of due care. The burden of proof, in such a case, is upon the company to show contributory negligence." This case has become a leading case upon the subject, and has been quite generally followed and approved in the courts of last resort in a large number of states, and we think it is now the generally recognized rule of law in this country. Among the many cases, in which the *Hough* case has been cited and approved, are the following: *Crooker v. Pacific L. & M. Co.,* 29 Wash. 30, 34 Wash 191; *Lyttle v. Chicago & W. M. R. Co.,* 84 Mich. 289; *Roux v. Blodgett & Davis L. Co.,* 85 Mich. 519; *McFarlan Carriage Co. v. Potter,* 153 Ind. 107; *Manufacturing Co. v. Morrissey,* 40 Ohio St. 148; *Maryland Steel Co. v. Engleman,* 101 Md. 661; *Dowd v. Erie R. Co.,* 70 N. J. Law, 451. The reason, upon which the rule is grounded, is that the master, by inducing his servant to go to work or continue at work with dangerous or defective tools or appliances, under a promise to repair the same, insures the servant against injury from such defects during the time that the servant labors with the defective tools or appliances relying upon the promise to repair. By his promise to repair, the master waives any right to complain of what would otherwise be the contributory negligence of the servant. And, where, by promises of repair, he has induced the servant to continue in the use of defective appliances, the master has thereby debarred himself from pleading any assumption of risk by the servant. Under this rule, Sapp had a right to rely upon the promise of the appellants to remedy the defects complained of, and would not be guilty of contributory negligence, nor would he assume the risk of injury arising from the use of the defective appliance until after the lapse of such a period of time as would preclude all reasonable expectation that the promise of repair would be kept.

Appellants contend that the promise was too vague and indefinite, and that more than a reasonable time had elapsed after the promise, and that therefore it should have been held, as a matter of law, that Sapp assumed the risk. With reference to the first of these contentions, it is sufficient to say that the assurances, though somewhat indefinite, were apparently sufficient to induce the servant to rely upon them. And, where the master has induced the servant to rely upon his promises, though vague and indefinite, he is in no position to complain. If the promises and assurances were sufficient to induce the servant to rely upon them, they should be sufficient for his protection. With reference to the second of these contentions, we think it was properly a question of fact to be determined by a jury, as to what was a reasonable time under all the circumstances. We are not at liberty, under the evidence in this case, to say, as a matter of law, that the time from Monday morning to the following Thursday forenoon was sufficient to induce the servant to believe that the master would not fulfil his promise.

Appellants also contend that the promise was not one for immediate fulfilment, but was not to be fulfilled in any event until the orders were caught up, and, pending the time that the orders would be caught up, the servant must assume the risk. This contention seems to be supported by the case of *Standard Oil Co. v. Helmick*, 148 Ind. 457. We do not think this doctrine is sound, for it is the duty of the master to make repairs, and this is a continuing duty; and, when he, by promises of repairs, induces the servant to continue in the employment with dangerous and defective appliances, he ought, upon sound reason, to be debarred from alleging contributory negligence or assumption of risk in that respect.

Appellants further contend that, when Sapp was at the top of the little hill, down which he had to drive before reaching McMaster's shed, he there stopped and considered whether or not it was safe to drive down the steep hill with his wagon-load, knowing the neck-yoke was defective,

and that he was liable to be injured. The evidence does not disclose such a state of facts. It only shows that he stopped for an instant at the top of the hill before driving down it, apparently to take such precaution as he could to drive carefully.

Appellants also complain because the evidence discloses that the strap attached to the end of the neck-yoke first gave way, and that that was the cause of the accident. It is true that the evidence shows that this strap did first give way, but the evidence also discloses that the pole eye of the neck-yoke gave way, and this it was which let the tongue down and permitted it to run into the ground. We think the question was one for the jury. The case was properly submitted to the jury, and we think its findings are conclusive upon this court.

Some complaint is made of one of the instructions, but it is in harmony with the law as herein expressed, and was properly given.

The judgment of the district court was right, and we recommend that the former judgment of this court be adhered to.

DUFFIE and EPPERSON, CC., concur.

By the Court: For the reasons given in the foregoing opinion, the former judgment of this court is adhered to.

AFFIRMED.