JOHN LYNN, APPELLEE, v. OMAHA PACKING COMPANY, APPELLANT.

FILED MARCH 16, 1911.   No. 16,291.

1. **Master and Servant:** INJURY TO SERVANT: ASSUMPTION OF RISKS. Where a master has expressly promised to repair a defect, the servant does not assume the risk of an injury caused thereby within such a period of time after the promise as would be reasonably allowed for its performance.

2. ———: CONTRIBUTORY NEGLIGENCE. A servant, who has been induced by a master's promise to continue to work in an unsafe place, may do so without being guilty of contributory negligence and without assuming the risk of injury, so long as he may reasonably expect the master's promise to be kept, unless the danger is so obviously imminent and immediate that no reasonably prudent person would continue to work in that place. *Sapp v. Christie Bros.,* 79 Neb. 705.

APPEAL from the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Affirmed.*

*Greene, Breckenridge & Matters,* for appellant.

*Smyth, Smith & Schall, contra.*

LETTON, J.

In March, 1908, the plaintiff was in the employ of defendant in the hog-killing department of its packing house in South Omaha. In this department large numbers of men are employed. The evidence shows that after the hogs are killed the carcasses are taken from the vat in which they are scalded and suspended by the hind legs from a hook fastened to a grooved wheel which rolls upon an overhead track. During its progress along this track while thus suspended the carcass is cleaned, scraped, washed, and the entrails and head removed by different workmen, each of whom occupies a certain station and performs a certain assigned duty. The work is required to be rapidly performed, it being customary to kill and clean from 400 to 500 hogs an hour. One of the first operations after the hogs are scalded is to pass them through a scraping machine, where most of the hair is removed. From this machine the hog is rolled on a bench, where a man breaks or disjoints the neck bone and cuts the flesh and skin of the neck so that ordinarily thereafter the head is only attached by a small portion of flesh and skin. After a number of intermediate operations, the carcass in its progress reaches the tonguer, who stands in a pit about $3\frac{1}{2}$ feet below the floor. This man cuts the head off and removes the tongue. The next men in line are the back shaver and belly shaver, and the next man beyond them is the man who removes the kidney fat from the inside of the hog. This is dropped into a large pan placed on the floor, about 4 feet wide by 8 or 9 feet long, and 8 or 9 inches high.

49

As the carcass travels along the rail, it passes over the center of this pan. Beyond this workman are the government inspectors, who stamp the carcass, and from them it passes directly into the cooling room. The plaintiff, Lynn, at the time of the accident occupied the position of belly shaver. After the hogs passed the tonguer, Lynn's duty was to scrape the remaining hair from the belly, and, if the tonguer had been unable to remove all the heads, to cut off the heads before the carcass reached the kidney fat cleaner. Ordinarily there was about 35 feet between the pit where the tonguer stood and the fat pan, and Lynn had all of this space in which to cut off the head while the hog was moving along the track. On the day of the accident, the man who had been regularly employed as "header," and whose duty it was to dislocate the necks and nearly behead the animals, was not working, and an inexperienced or inexpert man took his place. The result was that the number of heads which the tonguer was unable to remove as the hogs passed him was much increased, and it became necessary for Lynn to remove from 10 to 15 heads in the same space of time in which ordinarily he would be compelled to remove only one or two. The day before the accident the lard pan, under the direction of the foreman, had been moved in such a manner as to allow Lynn only about 10 feet in which to work, instead of 35, and shortening the time within which to remove the heads. On that day he told the foreman it was impossible to do the work in that space. The foreman replied: "Well, you can do it if you want to. There is space enough there." On that day few carcasses came down with the heads on.

Plaintiff testifies that on Saturday, the day of the accident, in the forenoon, there would be about one in 8 or 10 carcasses on which the head remained, but in the afternoon after the "header" was changed there were many more. He testifies as follows: "Q. Now, did you say anything to the foreman or did the foreman say anything to you about the removal of those heads? A. Well,

I was letting them go past, and he says, 'Get them off.'
Q. He says what? A. I was shaving, letting them go
past mostly, because of the small space. He says, 'Get
them heads off, what you can of them.' Q. Was that in
the forenoon or the afternoon? A. This was in the after-
noon, about 3:30 I should say. Q. What did you say to
him then when he told you that? A I told him I hadn't
enough space to shave. Q. And what did he say then?
A. 'Well,' he says, 'go ahead and do the best you can, I
will fix that.' Q. Well, was the space in which you had
to work increased or made larger that afternoon? A.
No. Q. After he said that, did you continue to take
off the heads of those that came down, or try to take
them off? A. Yes, sir. Q. Did you receive any injury
there that afternoon? A. Yes; I cut this left arm get-
ting a head off. Q. Now, describe to the jury what you
were doing at the time you received your injury. 'A.
Well, I was shaving those bellies and cutting those heads
off, all I could cut. The necks were not broken, and it
was a very hard job to get a knife in between and cut a
head off there because you had to stoop so low, and the
pan was here. You couldn't step in the pan, that would
be the limit, and I reached over this pan to cut the head
off, that way (indicating), holding the head by the ear,
this way, in this hand, and was cutting it, and my foot
slipped and this knife came around with a swing and
chopped these tendons off, cut them right across. Q.
Now, at the time you received your injury, did you have
hold of anything with your left hand? A. Had hold of
the ear of the hog. Q. Had hold of the ear of the hog?
What did you have in your right hand? A. The knife.
Q. Now, where were you standing at that time with
reference to this pan in which the lard was put? A.
Well, reaching over the pan, holding the hog's head this
way (indicating) to cut the head off. * * * Q. Tell
the jury whether or not as you had hold of the ear of the
hog at that time you were able to walk any farther south
or follow the carcass any farther? A. I couldn't do it.

I couldn't go any farther. I had got to the limit. Q.
Why couldn't you go any farther? A. I would step into
the lard pan."

The witness also testified that. relying on the strength
of the foreman's promise to attend to the arranging of the
space, he continued in the work, although he knew it was
dangerous on account of the lard pan being in the way.
He also testifies that no definite promise was made as to
the time when the working space would be restored, but
that Moore said it would be done at the first opportu-
nity; that this would be when the rail was stopped—that
it might be in five minutes, or in an hour, or not until
Monday. This testimony as to the manner of the opera-
tion, the complaint made by Lynn, and the promise by
Moore is corroborated by other witnesses, and is not dis-
puted; the defense introducing no testimony.

Defendant contends that the court should have in-
structed the jury to return a verdict in its favor. This
contention is based upon the propositions that a servant
engaged in a hazardous occupation assumes the risk of
the injury to himself from all its obvious dangers, and
that the bloody, slippery, greasy floor which was a neces-
sary condition of the occupation caused plaintiff's foot
to slip, and this was the proximate cause of the injury.
If the evidence showed that the slippery condition of the
floor alone and without the intervention of any other
factor or element caused the plaintiff's foot to slip, and
that this alone was the proximate cause of the injury,
there might be ground for this contention, but the evi-
dence convinces us that, while the slippery floor, no
doubt, was one of the causes for the accident, it did not
result from this condition alone. It was plainly expected
of Lynn, and it was his duty, to make an effort to remove
all the heads that he could. Carcasses were moving in
front of him at the rate of seven or eight a minute, many
of them with heads attached. He had only a space of
about ten feet in which to work, his movements were
necessarily made rapidly, he had no time to weigh and

consider the chances he might take by reaching a greater or a less distance over the lard pan to detach the head. He believed the condition was temporary, and was justified in relying upon the promise that the former space would be restored. The conditions were unusual for the reason that, on account of the incompetent and inexperienced "header," unheaded carcasses were coming in unusual and excessive numbers. We think the evidence required the submission of the question of defendant's negligence, and that the instruction was properly refused.

Complaint is made that the court erred in the statement of the issues and in its instructions concerning the issues. We believe it unnecessary to set forth the instructions verbatim. In substance, in addition to the usual instructions as to the burden of proof, preponderance of evidence, etc., the jury were told that, in order to recover, it was incumbent on the plaintiff to prove that the defendant was negligent in not providing him with a safe place to work; that he received the injuries complained of by reason of defendant's negligence in failing to remove the lard pan; and that this failure was the direct and proximate cause of the injury. They were also instructed that if they found that the space provided for plaintiff in which to perform his work was not reasonably sufficient to enable him to perform his work with reasonable safety, and that after he ascertained this fact he complained to the foreman, who promised that the space should be enlarged, and if they found that plaintiff continued to work in reliance upon this promise, then he was entitled to recover for any injury occurring by reason of the insufficient space or room in which to perform the work, unless they found that the danger was so open and obvious that an ordinary, careful, and prudent person would have refused to perform the same. They were further instructed that, even if the promise had been made, this alone would not make the defendant liable; that the evidence discloses that the plaintiff was working in a slippery, greasy place, and

among the risks which were inherent in his service was the risk that his feet might slip and slide in the grease and filth on the floor, and if they believed from the evidence that while in the act of beheading a hog the plaintiff slipped and lost his balance, and the slippery floor was the proximate cause of the injury, then the plaintiff was not entitled to recover, for the reason that he assumed the risk of the slippery floor. These instructions with the others given seem to present the issues fairly.

It is complained that the fifth instruction "does not submit the negligent insufficiency of the space as a question of fact, but it assumes that the space" was too small, and that the defendant was negligent. But the second instruction told the jury that it was incumbent on the plaintiff to prove that the defendant was negligent in not providing plaintiff with a safe place to work, and the fifth instruction in this respect is as follows: "You are instructed that if you believe from a preponderance of the evidence that on the day of the accident the space or room provided for the plaintiff in which to perform his work was not reasonably sufficient to enable him to perform his work with reasonable safety," etc. It will be seen that defendant's negligence was not assumed by the court, but whether negligence existed or not was left to be determined by the jury. The remainder of this instruction lays down the principle announced in *Sapp v. Christie Bros.*, 79 Neb. 701, 705. The syllabus to the latter opinion is: "A servant, who has been induced by a master's promise of repair to begin or continue to work with defective appliances, may use such defective appliances without being guilty of contributory negligence and without assuming the risk of injury from such defects, so long as he may reasonably expect the master's promise of repair to be kept, unless the danger from using such defective appliances is so obviously imminent and immediate that no reasonably prudent person would begin or continue to work with them."

Defendant contends that this principle is not applicable,

because in *Sapp v. Christie Bros., supra; Lee v. Smart,* 45 Neb. 318, and *Sioux City & P. R. Co. v. Finlayson,* 16 Neb. 578, the defect was not a matter in dispute; and, further, because the time in which Lynn expected the change to be made had not commenced to run.  As to the first point, we are of opinion that the evidence clearly shows the curtailed space was insufficient, and the foreman virtually acknowledged this to be the fact by his promise to change.  When we consider the work that was expected of plaintiff, his facilities for performing it, and the time and space allotted, we think the jury were justified in finding the place defective.

As to the second point, Lynn expected the change to be made as soon as convenient, and we think it clear that the time during which he continued in the employment after the promise was within a reasonable time for the promise to be made good.  As he says, he did not expect the work of the gang to be stopped for him, but he did expect that the change would be made at the first convenient opportunity.  It is unnecessary to consider the reasons for this principle.  They may be found set forth in the extensive note to *Illinois Steel Co. v. Mann,* 40 L. R. A. 781 (170 Ill. 200) ; *Rice v. Eureka Paper Co.,* 174 N. Y. 385, 62 L. R. A. 611; *Swift v. O'Neill,* 187 Ill. 337; as well as in the opinions of this court above referred to.  We think this case is within the rule.

The judgment of the district court is

AFFIRMED.